[No. H024077. Sixth Dist. Dec. 11, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN JAMES JENSEN, Defendant and Appellant.

226

**COUNSEL**

J. Courtney Shevelson, Under Appointment by the Sixth District Appellate Program for Appellant.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Ronald E. Niver, Deputy Attorney General for Plaintiff and Respondent.

**OPINION**

**MIHARA, J.**—Defendant was convicted by jury trial of nine counts of attempted distribution or exhibition of harmful matter to a minor over the Internet (Pen. Code, §§ 288.2, subd. (b), 664). He admitted that he had suffered six prior serious felony convictions within the meaning of Penal Code sections 667, subdivisions (b) to (i) and 1170.12. Defendant was committed to state prison to serve a determinate term of three years consecutive to an indeterminate term of 25 years to life. On appeal, he claims that the trial court prejudicially erred in (1) defining the "intent or purpose of seducing" element of the offenses, (2) defining the "harmful matter" element of the offenses, (3) failing to instruct on the lesser offense of attempted misdemeanor distribution of harmful matter and (4) giving the 2000 version of CALJIC No. 2.50.01. He also claims that his sentence constitutes cruel and unusual punishment. We agree with defendant's first contention and reverse the judgment.

## I. Factual and Procedural Background

The "Child Exploitation Detail" of the "Sexual Assault Investigative Unit" of the San Jose police department is composed of several police officers who, among other things, "go into [Internet] chat rooms seeking out individuals who desire to sexualize with children." Officer Mark Clough is assigned to this detail, and Sergeant David Michael Hewitt is in charge of the detail. Clough had heard from "other agencies" that "child predators" could be found in a chat room called "BarelylegalM4oldrM," and he had previously arrested someone whom he had met in this chat room. Hewitt knew that "gay men gathered" in this chat room and often engaged in conversations that were "sexual in nature." Such conversations often involved discussions of "penis sizes," "sexual acts" and "threesomes," and the trading of photographs.

Clough created an America Online (AOL) profile identifying himself as a fictitious 13-year-old boy named "Scotty" living in Campbell with a birthdate of May 12, 1985. His screen name was "scotty0585." "Scotty" stated in his profile that his occupation was "astronaut." On December 23, 1998, Clough entered the "BarelylegalM4oldrM" chat room using "Scotty's" screen name. "Scotty's" profile was available to the other occupants of the chat room. Clough soon received an "instant message"[1] from defendant.[2] Defendant's AOL profile, which did not include his name, identified him as a 38-year-old "GWM-Happily Committed" theatre manager. The profile also said, "Don't let the age fool ya. Look alot younger" and "Self Pic Available!!!" After just a few lines of messaging, defendant asked Clough if he had a "self pic . . . to trade." Clough responded, "if u send one first." Defendant said he had "a g and x would you like both." Clough responded in the affirmative, and defendant sent Clough two photographs by e-mail. One of the photos was a black-and-white photo of defendant, naked with an erect penis. The other was a fully clothed photo of defendant. Clough asked defendant if he had ever "been with a guy my age." Defendant said "yeah" and asked Clough if he had "ever been with someone my age." Clough said he had "messed with" a boy his own age. Clough asked, "the guy u were with like u?" Defendant responded, "very much." He told Clough he would put him on his "buddy list"[3] and the conversation ended.[4]

---

[1] An "instant message" is a private "one-on-one correspondence" that is not visible to the other occupants of the chat room.

[2] Defendant's screen name was "leoprio1." His true identity was discovered by service of a search warrant on AOL in January 1999. When Clough learned defendant's identity, he discovered that defendant had prior convictions involving sexual offenses with minors.

[3] A "buddy list is a quick way you can identify people who are online and you wish to have contact with."

[4] Defendant was not convicted of the count based on this conversation.

On December 30, 1998 (count 2), Clough again entered the same chat room, and defendant initiated another conversation. Clough told defendant that he had erased the photos, and defendant again sent those two photos plus one more. The new photo depicted a man being both orally copulated and sodomized simultaneously. The file was called "!2on1kid." Defendant told Clough that he was 37 and asked, "is that too old for you." Clough replied, "is 13 to yung for u." Defendant said "no." Defendant told Clough that he had a sexual relationship with someone Clough's age "for over a year." He said, "younger guys are just alot of fun" because "they can be taught stuff and they are inexperienced." Defendant then questioned Clough about his sexual experience, and Clough described having touched both a male and a female. Defendant asked, "do you shoot far when you cum" and "how often do you jack off." He also asked, "how big is your cock" and "are u hard right now." Clough responded affirmatively. After a bit more conversation, the conversation ended.

On January 13, 1999 (count 3), Clough logged on to AOL but did not enter a chat room. He received an instant message from defendant. Defendant asked Clough, "is your cock hanging out?" and suggested that Clough send him a picture of himself. Clough said he lacked the money to do so. Defendant suggested that Clough "[g]o to the mall and sell your butt for one day you can probably get at least 100 bucks :)"[5] Clough responded, "thats tore up, dude," and defendant said he was "just kidding" and "would never want you to do that." Clough asked defendant if he was "ever comin to San Jose," and defendant said, "[p]robably not till next spring to go to Marriotts."[6] Defendant suggested, "[w]e could touch each other on the rides" and then "come home and fuck 'till our heart's content." Defendant promised to "teach" Clough and said it was "fun to make a young guy experience new things because you can really get them off." He asked Clough if he was "hard right now" and touching himself. Clough replied affirmatively.

Defendant engaged Clough in some brief sexual talk, and he sent Clough the same "x" photo of himself that he had sent previously. Clough asked defendant his name, and defendant truthfully told Clough his name was "Marty." Defendant asked Clough what he was doing. Clough replied, "u the teacher marty." Defendant said, "I teach better in person" and explained that he taught "[t]he finer arts of boy love" including "rubbing and sucking and kissing and fucking and cumming all over each other." Clough said "[w]ith me?" and defendant responded, "[i]f you want." Defendant asked Clough if he was "gonna jack off." When Clough said "yea," defendant asked him to "do it and tell me what your doing." Defendant asked Clough if he was "touching your cock," but then he almost immediately terminated the conversation.

---

[5] A colon followed by a closing parenthesis is used on the Internet to signify a smile.

[6] Marriott's Great America is an amusement park in Santa Clara County.

On February 5, 1999, Clough sent an e-mail to defendant. On February 8, 1999, defendant sent an e-mail in reply. On February 17, 1999, Clough was logged on to AOL but not in a chat room. He received an instant message from defendant. Clough asked defendant if he was coming to San Jose "anytime." Defendant said "not in a while." Clough asked if he was coming to San Jose "anytime soon," and defendant said, "I always go to Great America." The conversation soon terminated.

On February 25, 1999 (count 4), Clough sent an instant message to defendant. He told defendant that his "mom" was going to be leaving him home alone for a couple of days. Defendant asked him if he was going to "invite a guy over to fuck all night?" Clough responded affirmatively and extended an invitation to defendant. Defendant asked, "where do you live again," and Clough said Campbell. Defendant said, "I just wish you lived closer to me" and "it would be cool if we were closer so we can have an afternoon fuck if we wanted." They discussed "Scotty's" masturbation history, and defendant asked Clough to "jack off for me" and "tell me everything that you are doing while you jack off." At Clough's request, defendant again resent the same "x" photo. Defendant tried to convince Clough to engage in phone sex, but Clough expressed reluctance. He said, "u relly arent gonna come here?" and defendant replied, "I don't know I would like to." Defendant told Clough that he would like to orally copulate him "if you would let me." He asked Clough, "could you fall in love with me and live with me forever." Defendant also asked Clough to "think of me tonight when you are jacking off ok." The conversation ended shortly thereafter with defendant encouraging Clough to consider phone sex the following week.

On March 9, 1999, Clough initiated a conversation with defendant by sending him an instant message. Defendant responded by sending Clough some photos in which he was fully dressed.

On March 17, 1999 (count 5), Clough again initiated contact by sending defendant an instant message. Defendant sent Clough one new photo and one photo he had previously sent. The new one was a photo of one naked male digitally penetrating the anus of another naked male. The other photo was the "!2on1kid" photo. They discussed masturbation. Clough asked for more photos, and defendant said, "are you a cop." Clough said "hahaha, no fbi." Referring to the new photo, defendant asked Clough if he would "do that with me." Clough responded affirmatively. He also asked Clough if he would do what was depicted in the "!2on1kid" photo. Clough declined. They talked about masturbation some more. Defendant asked Clough if he wanted to touch defendant's penis. Clough said "yes for sure." Defendant said, "hopefully someday," and the conversation concluded.

On March 30, defendant initiated contact again by sending Clough an instant message. Clough again said that his "mom" was going to be leaving him alone. Defendant asked if Clough was "looking to hook up with someone" and said "I wish it could be me." Defendant asked Clough if he had been masturbating while thinking of defendant, and Clough replied affirmatively. They talked more about masturbation, and Clough asked if defendant had a boyfriend. Defendant said he did, but "we have kinda have an open relationship." Defendant asked Clough, "would you do a threesome with us." Defendant sent Clough photos of his boyfriend fully dressed.

On April 13, 1999 (count 6), defendant sent Clough an instant message. He said he wished he could take Clough to Lake Tahoe "some day and make love [to] you outdoors under the moon." Expressing frustration, Clough said, "if u aint ever comin here u can tell me." Defendant responded, "I never say never." When Clough continued to express frustration and said, "get down here," defendant replied, "I would if I could." Clough responded, "I don't kno if i cud get there had a ride i wud go NOW!" They talked about masturbation and what "Scotty" looked like. Defendant continued to ask Clough for a photo and to suggest phone sex. At one point, defendant asked, "can I lick your balls." He also said, "I wish you were closer I would come and get you." Clough asked, "why cant u come here?" Defendant asked where they could meet that would be private. Clough said, "my house, my frends extra house, that's easy just getting u here is hard." Defendant asked, "what time would I be able to see you" and "could you get out of school," but then he immediately said, "you would probably have the cops waiting for me :)" Clough insisted "I AINT A SNITCH DUDE." Defendant replied, "ok ok, but that kind of shit scares me," and suggested that "maybe sometime this summer we can meet." Clough sulked, "we aint gonna hook up i kno it." Defendant responded, "I would have to leave in the morning and be back before Kevin [defendant's boyfriend] gets off of work . . . would that be acceptable." Clough was agreeable. Defendant said, "I think that can be arranged then." They engaged in some more talk of masturbation. At Clough's request, defendant again sent him the same "x" photo of himself that he had sent previously. Clough told defendant "get down here fool," but defendant just responded ":)"

Their final contact was initiated by defendant at a little after 2:00 p.m. on November 2, 1999 (count 7).[7] Defendant offered Clough "some new self pics" and then sent some fully clothed snapshots of him and of his boyfriend.

---

[7] They had continued to have contact on numerous occasions between April and October, but none of those contacts led to a charged offense.

On April 20, 1999, Clough initiated contact by sending defendant an instant message. They talked about masturbation and other topics. Defendant again asked Clough for a photo and suggested phone sex. Clough put him off. On April 21, 1999, Clough sent defendant an e-mail. Defendant did not respond until May 4, 1999 when he sent Clough an instant message. They

He again suggested that Clough "move in with us and we can take care of you." This colloquy then occurred: Clough: "when"; Defendant: "when do

spoke of masturbation and defendant again sought a photo of "Scotty."

On May 13, defendant again sent Clough an instant message. Clough told defendant that he had turned 14 the day before. Clough again said that his mom was going to leave him alone. Defendant replied, "maybe I should come see you on one of those days when your alone," but then he said, "It would be so cool if you lived a little closer." At the end of the conversation, defendant said, "Take care and Happy Late Birthday I wish I could come there and give you the present that you want."

On May 18, defendant again initiated contact by sending an instant message. He told Clough that he had not "been with anyone" during his two-year relationship with his boyfriend. Then he said, "yeah until I fuck your brains out :)" On June 22, 1999, defendant initiated another contact. He asked Clough, "when are we going to have sex :)" They talked of masturbation, and defendant again sought a photo. Defendant also again said, "I wish you were closer to me." When Clough asked, "when u comin to here?" defendant responded, "I'm not sure."

The next contact was initiated by defendant on August 31, 1999. Clough asked, "did u ever come to san jose this summer." Defendant said "[n]o." Defendant said he "really love[d]" his boyfriend who was "a great guy, but you could always move in and we could take care of you." Clough said, "both of u?" Defendant responded, "yeah we could have a threesome." But then he indicated that he and his boyfriend had been "too shy" to have a threesome with one of their friends. Defendant said, "If you lived closer I would have met you a long time ago believe me." Clough responded "LIAR." He said, "if u wanted to u wud have come here." Defendant said, "how would I explain being gone all day to Kevin." Defendant mentioned that he had a jeep, and he offered Clough a ride in it and asked Clough, "would you let me get you naked in it." Clough responded affirmatively. Defendant said, "I could make love to you outside in Tahoe that would be cool." He asked Clough, "do you think your mom would let you go." Clough indicated that he could manage, but said "we pretend to much marty." Defendant replied, "well we kinda have to since we are so far apart." Clough said, "when u comin here." Again, defendant said "I don't know." He said, "I wish I could say I would. be right over." "I could say it easy enough, but I don't want to lie to you." He asked Clough if he would "have sex" with both defendant and defendant's boyfriend. They talked about masturbation. Defendant again asked for a photo, and he provided Clough with his work address so Clough could mail him a photo.

Defendant initiated another contact on September 7, 1999. They briefly spoke of masturbation. He initiated another contact on September 29, 1999. Clough complained about having to take care of his mom, and defendant said, "well I wish I could come take you away." Clough responded, "LIAR LIAR." Defendant said, "well I would like to, but I would probably get arrested and sent to prison" and "I don't think I would like that." Clough responded "whatever." Defendant said, "do you think that I would like getting arrested." Clough responded, "HOW wud u get arrested marty." Defendant said, "your mom might have something to say to that." Clough told defendant that another man he had met online wanted to meet him. Defendant warned him to "be very careful if you decide to meet him." He again suggested that Clough "do a threesome" with him and his boyfriend. Defendant also again asked for a photo and suggested phone sex. Clough lamented that defendant was "so far away." Defendant asked if he should take Clough off his "buddy list." He also asked Clough, "if you could come would you leave right now and live with me." Defendant said, "if there was no chance of me getting arrested I would drive down and get you." Clough became indignant. Defendant said, "maybe we could arrange something then" but "I don't know what I would tell Kevin." He asked Clough, "would you like to have a movie of you and I." Defendant said he "would love to be able to have you on tape nude and our bodies together." They talked about their penises for a while and then exchanged declarations of love.

On October 12, Clough initiated contact with defendant. He claimed he had been in

you want to"; Clough: "today"; Defendant: "we have room come on down"; Clough: "u 11 pick me up in 3 hrs?"; Defendant: "I'm sure you mom will just love that"; Clough: "shes cool ok ill see ya in a bit"; Defendant: "LOL"[8] "I'm sure she would have us arrested"; Clough: "want directions"; Defendant: "you are so funny." Defendant made it clear that he did not believe this was a viable plan.

When Clough said that his mom would like to meet him, defendant said "she would want to meet me to have me arrested." They engaged in a little sex talk, and defendant said, "I wish you lived closer." Clough said, "tell me now that u are coming here in the next 2 weeks." Defendant replied, "I would come and get you if you lived in Sac." When defendant refused to set a time to meet, Clough said he had to go. Clough said, "i cud have met like 500000000 guys by now." Defendant said, "[w]ell if that's what you want, just be very careful there are alot of fucking weirdos out there." Defendant said he would take Clough off his buddy list if Clough wanted. Clough responded affirmatively. Defendant said, "I guess its better that we didn't meet in person who know what would have happened." He also said, "how do I know you are who you say you are." "I really don't even know you." Clough sniped back, and defendant ended the conversation with "have a good life Scotty."

Hewitt created an AOL profile that identified him as a fictitious 13-year-old boy named "Ryan" who lived in San Jose using the screen name "Insanjose4u." On November 2, 1999, at about 5:00 p.m. (count 8), Hewitt entered the "BarelylegalM4oldrM" chat room. Hewitt did not do anything after he entered the chat room but simply waited to be approached. After five minutes, "a number of people," including defendant, sent him instant messages. Hewitt began to "chat" with defendant. Because Hewitt recognized defendant's screen name from Clough's contact with defendant, he contacted Clough, and Clough sat in Hewitt's office while Hewitt conversed with defendant. Defendant e-mailed two photographs to Hewitt. One was the same "x" photo of defendant that he had sent to Clough. The other was a photo of defendant fully dressed.

Hewitt described engaging in sexual activity with an "older guy" he had met in a chat room. Hewitt asked defendant if "Ryan" was "2 young for you," and defendant responded, "[n]o just as long as your not a cop." After defendant told Hewitt that he worked at a movie theater, Hewitt asked if defendant would take him to the movies "one day." Defendant said, "I would love to" but "only if you let me play with you in the back of theatre." Defendant claimed, "I can make you shoot into the popcorn and then we can

---

Sacramento that weekend. Defendant suggested that Clough move to Sacramento, but Clough said his "mom" would not do so. They did not engage in any sexual discussion.

[8] "LOL" is used on the Internet as an acronym for "laughing out loud."

eat it." He asked Hewitt, "is your cock hard now." Hewitt responded affirmatively. Defendant suggested phone sex, but Hewitt declined; "not on the first date." Hewitt asked defendant, "would you like to get together someday, and go to the movies." Defendant said "maybe" and insisted that he would not meet Hewitt unless they talked by phone first. Defendant asked Hewitt to put him on his "buddy list." He also asked Hewitt, "are you going to jack off thinking about my pics." Hewitt responded, "i have and will."

The next day, at about the same time of day, Hewitt again logged on to AOL as "Ryan." He did not enter a chat room, but he "[a]lmost immediately" received an instant message from defendant. Defendant asked Hewitt "did you get hard today." Hewitt said, "i get hard every day." Defendant also asked Hewitt, "where is the weirdest place you jacked off." At the close of the conversation, Hewitt reminded defendant "i got ur pics." Defendant said "use them." After this conversation, Hewitt handed over the investigation to Clough.

On November 9 (count 9), defendant initiated another contact with "Ryan." Defendant and Clough discussed masturbation. Defendant said his name was Marty. Defendant asked Clough, "would you meet me," and Clough asked where he lived. After defendant explained that he was 140 miles away, defendant said, "if we were closer would you let me pick you up" and "would you let me kiss you." Defendant said he had a boyfriend "but we have an open relationship." He asked Clough to send him a photo, but he did not want Clough to send it to his home. "I guess I'm a little nervous with you having my home address." "[N]ever know you might be working for the cops LOL." "[Y]our dad might be a cop and find out and have me arrested." Clough asked, "[y]ou can get arrested if I send my picture?" and defendant replied "probably not" "but we get sexual on the puter I'm not sure if that is illegal or not." When Clough asked, "can anything happen to me," defendant responded, "I don't think anything can happen to either of us and certainly not to you . . . ."

Clough asked, "[w]as it illegal for you to send me those x pictures." Defendant said, "yeah" "ru going to call the cops now." Clough said "NO." Defendant said, "[t]he laws says someone your age doesn't really know what he wants." "[T]he laws say you shouldn't at the age really know what you want and someone like me can take advantage of that because I am older." Clough inquired, "[d]o YOU want to be with me?" Defendant said, "I would not hesitate because you sound like a really cool guy." Clough said, "I know im 13, but I know what I want!" He asked if defendant had been with anyone his age, and defendant said, "the youngest was 14 and I was about 29." "[I]t was really fun and he loved me too we messed around for 6 months then he moved." Defendant said, "you read in the paper all the time about guys

getting arrested because they had sex with someone underage." "I think it sucks, because its usually the parents that have them arrested." Defendant asked Clough about having phone sex. Clough asked, "[i]s that illegal?" Defendant said, "you know I don't know."

During this conversation, defendant sent Clough a group of photos that included fully clothed photos of defendant and his boyfriend, the "x" photo of defendant, the !2on1kid photo and one new photo of two males with erect penises sitting side by side. After sending these photos, defendant said "don't get me arrested." Clough asked, "[c]an you get arrested for sending me that [the !2on1kid photo]?" Defendant said, "probably" "because of your age I think." They talked more about masturbation. Defendant told Clough that he wanted to "start licking" his body.

On November 30, 1999, defendant contacted Clough again, and they chatted briefly about masturbation. On January 11, 2000 (count 10), defendant contacted Clough again. He sent several photos to Clough including the "x" photo of himself. Defendant asked Clough, "so when you gonna come and be our son hehe." Clough said he had phone sex with someone else, and they discussed having phone sex. On February 1, 2000, defendant contacted Clough again.[9] They had a fairly innocent conversation with no explicit sexual content.

Clough obtained an arrest warrant for defendant and a search warrant for defendant's Sacramento home. On February 8, 2000, Clough went to defendant's home and arrested him. Clough seized defendant's computer.[10] Clough told defendant that "a mother" was "complaining" about him. Defendant told Clough that he had been "chatting with people online," and he admitted that he had chatted with "Ryan" and "Scotty" after meeting them in the BarelylegalM4oldrm chat room. Defendant believed that both "Ryan" and "Scotty" were "14 or 15" years old. He admitted that he had talked to both of them about "what he'd like to do with them sexually" and sent them pornography. Defendant said, "[h]e would tell them sexual things to do to themselves and his goal was to get them to masturbate to the point of ejaculation."

Defendant told Clough that he had many people he thought were minors on his "buddy list." Defendant said he had not met any of these people.

---

[9] Clough was using the screen name "DaSpunkyboy" for this conversation.

[10] Clough found pictures that he believed were child pornography on defendant's computer. These pictures were apparently either found in the "recycle bin" or were deleted files that were retrieved using specialized software. This was the basis for the possession of child pornography count of which defendant was acquitted. No other sexually explicit items relating to children were found in defendant's home.

Defendant admitted that he was "sexually attracted to males between the ages of 15 and 28," but he said he had not had sexual contact with any minors since 1988. Clough asked defendant if he would "engage in sexual activity" with "Scotty" or "Ryan" if they lived in an apartment adjacent to defendant. Defendant said, "there was a good possibility that he would, but he certainly would hope he would not." Defendant told Clough that he never met "Ryan" or "Scotty" because "he was afraid of the police and if he was caught, that it would ruin his life and hurt his family."

Defendant was charged by information with 10 counts of attempted distribution or exhibition of harmful matter to a minor over the Internet (Pen. Code, §§ 288.2, subd. (b), 664) and one count of possession of child pornography (Pen. Code, § 311.11, subd. (a)). It was further alleged that he had suffered six prior serious felony convictions within the meaning of Penal Code sections 667, subdivisions (b) to (i) and 1170.12. The prior conviction allegations were bifurcated at defendant's request, and he subsequently admitted those allegations.

The defense objected in limine under Evidence Code section 352 to the admission of evidence of defendant's prior sex offenses under Evidence Code section 1108. Defendant's trial counsel argued that CALJIC No. 2.50.01 was inadequate to protect defendant from the damaging impact of evidence of his prior offenses. The trial court found that evidence of defendant's 1981, 1982, and 1983 offenses would be "unduly prejudicial because of the number of victims and also the nature of the sexual activity," but it concluded that evidence of defendant's 1988 offenses was "more probative than prejudicial in the context of an 1108" and therefore was admissible.[11]

D.C., the victim of defendant's 1988 offenses, testified at trial in the prosecution's case-in-chief. D.C. recounted how he had become "friends" with defendant after meeting defendant at the store where defendant worked next door to D.C.'s home. At the time, D.C. was 12 years old. On about ten occasions, defendant touched D.C. "in a sexual manner."[12] Defendant never threatened D.C. in any way or told him not to tell anyone, and he never talked to D.C. in a sexually suggestive manner. During cross-examination, D.C. mentioned at one point that defendant "had been to prison."[13]

Defendant presented an expert witness at trial who testified that gay chat rooms and heterosexual chat rooms were "not that different" and "the

---

[11] On the other hand, the court ruled that all of the prior convictions would be admissible to impeach defendant if he testified. Defendant did not testify at trial.

[12] No further details of the sexual contact were described except that D.C. had not touched defendant.

[13] Actually, defendant had never served a prison term. He had twice served jail terms as a condition of probation.

behavior is remarkably similar . . . ." "[I]n these chat rooms, people are having electronic sex in minutes. . . . [¶] Likewise, things you would not think of doing in real life, you do in entertainment [in chat rooms]." This expert opined that people generally went to chatrooms "for entertainment purposes only." In gay chat rooms, there is "very much sexual, seductive type of talk. Lots of talk about very much explicit conversation." "[Y]ou often see a lot of talk about masturbation in those chat rooms and there's also a lot of talk about what-I'd-like-to-do-to-you type of things, I'd like to lick you here, touch you there." He also said that there was a lot of talk about penis size.

The prosecutor opened his argument to the jury by calling defendant a "child molester" and "sexual predator." "[D]efendant wants to have sex with boys, has had sex with boys. That's his predisposition." The jury deliberated for one full day before returning guilty verdicts on nine of the 10 attempted distribution counts. It acquitted defendant of the initial attempted distribution count based on the December 23, 1998 conversation and of the possession of child pornography count. The court struck the prior conviction findings as to eight of the nine counts, imposed a 25-years-to-life sentence on the remaining count and imposed consecutive mitigated terms for the remaining counts. Thus, the court committed defendant to state prison to serve a determinate term of three years and an indeterminate term of 25 years to life. Defendant filed a timely notice of appeal.

## II.  Discussion

### A.  Instruction on Definition of "Intent or Purpose of Seducing"

Defendant asserts that the trial court's definition of the "intent or purpose of seducing" element of the charged offenses was prejudicially erroneous because it permitted the jury to base a conviction on defendant's intent to persuade "Scotty" and "Ryan" to masturbate alone rather than requiring an intent to persuade them to participate in sexual activity *in partnership with defendant*. The Attorney General concedes that the statute may "plausibl[y]" be construed to require more than merely "encouraging the minor to engage in auto-gratification in the physical absence of the accused." Nevertheless, he insists that the trial court's instructions were not erroneous because the jury was not reasonably likely to construe the instruction as defendant asserts. The Attorney General's alternative argument is that the instruction was harmless error.

#### 1.  Background

The distribution counts charged that defendant had acted "with the intent and for the purpose of seducing the minor." The court initially incorrectly

instructed the jury on the intent elements of these crimes. It stated that the required intent was "A, the intent of arousing, appealing to, or gratifying the lust, passions or sexual desires of that person or of the minor; *or* [¶] B, with the intent or for the purpose of seducing the minor." (Italics added.) At the request of the defense, the jury was instructed that "the word 'seduce' means persuading one into sexual intercourse or other sexual activity, not mere discourse." The court did *not* give another defense-requested instruction that would have stated: "DEFINITION OF SEDUCE: [¶] *'Persuading into partnership in sexual intercourse.' People v. Hsu* (2000) 82 Cal.App.4th 976 [99 Cal.Rptr.2d 184]."[14] In instructing on the possession of child pornography count, shortly after giving the instruction on the meaning of "seduce," the court told the jury that " '[s]exual conduct' means any of the following. Whether actual or simulated: Sexual intercourse . . . *masturbation* . . . sexual lascivious exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer . . . whether or not any of the above conduct is *performed alone* or by members of the same or opposite sex." (Italics added.)

In his opening argument to the jury, the prosecutor told the jury that the two intent elements of the crime of distribution were *disjunctive*. At the completion of the prosecutor's opening argument, the court realized that it had made a mistake in its instructions on these intent elements, and the prosecutor conceded as much. The prosecutor then briefly argued that both intents had been proven. "Intent to arouse, justify the lust passion and seduce. And that's been everything you've heard as well. He talks about F-ing the victims, talks about having sex with them, talks about meeting them to have sex, those things, rather than 'or.' And the instruction was incorrect. And that's all that. [¶] So again, the evidence is well within as it relates to and/or because you will see exactly what he says about what his intent is."

The court then provided the jury with a corrected copy of the instruction and read the corrected instruction to the jury. The corrected instruction described the two intent elements as, "with the intent of arousing, appealing to or gratifying the lust or passions or sexual desires of that person or of the minor, *and* with the intent, or for the purpose of seducing a minor." (Italics added.)

---

[14] At the instruction conference, the court stated, "I did include your other one in a modified form we all agreed to." Defendant's trial counsel then interjected, "For the record, I would object it's not being included." The court said, "Are you talking about number 2? I was about to move on to that. I was going to state where I did include that in the report." Defendant's trial counsel responded, "You did." The court then said, "[i]n a form somewhat modified everyone agreed to." Defendant's trial counsel began to respond, "Yes, Your Honor. Form number 2 encompasses—" but the court cut him off. There was no further discussion of the instruction on the definition of "seduce." The reference to "[f]orm number 2" was to the defense-requested instruction on the seduction element that was *not* given.

Defendant's trial counsel's closing argument was primarily based on his contention that defendant had lacked the intent to seduce. He maintained that defendant's conversations with "Ryan" and "Scotty" were "for entertainment and nothing else." He argued that defendant "was involved in fantasy, entertainment." He asserted that there "was no indication whatsoever that he ever intended to meet these boys." Defendant's trial counsel did not claim that masturbation could not be a goal of a seduction, but he claimed that it had not been achieved. "Well, folks, there is no way for them to prove that masturbation ever occurred. Remember, on the Internet, you can't prove activity. All you've got is words. Words."

The prosecutor argued that it was not necessary that a meeting be intended. "It's to seduce for other sexual acts. It doesn't say you have to do that, doesn't say there has to be a meeting, doesn't say there has to be physical contact. What is your intent? Intent to seduce or get this other person to submit to a sexual act, *masturbation*, oral copulation, anal sex, repeatedly asking about those things. [¶] On the chats, it's very clear, and he talks about sex all the time in all the chats." (Italics added.) "[A]gain, I don't have to prove the contacts *or the intent to contact . . . .*" (Italics added.)

After several hours of deliberations, the jury submitted the following question: "Regarding 'special instruction # 33', there seems to be some kind of confusion regarding the word 'into'. Our question is simply; does there need to be a cause and effect, or can we define 'into' as meaning leading to?" Special instruction No. 33 was the instruction that stated, "the word 'seduce' means persuading one into sexual intercourse or other sexual activity, not mere discourse." The trial judge responded in writing: "We do not understand your question could you clarify it or ask it in a different way." The jury responded: "Re: Special Instruction # 33 [¶] Can the court give us a working definition for the phrase 'persuading one into'? If something is asked to be done, does the mere asking of something to be done satisfy or does the act need to be completed? I hope this makes sense." After consulting with counsel, the court responded in writing: "Are you asking whether there needs to be a completed sex act?" The jury responded: "Yes. Do we need to see confirmation (in text) on 'Scotty' or 'Ryan's' part that 'they' were persuaded 'into' a sex act? We mean that 'Scotty or Ryan' told the defendant they did the act." The court responded: "No. For intent, you should read instruction number 33 in conjunction with instruction number 31, page 2, number 4." The trial court's reference was to the portion of the instruction on the elements of the offense that stated, "The exhibition of the harmful matter was done with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor." The jury reached its verdicts shortly after receiving the trial court's response.

## 2. Analysis

"In deciding whether an instruction is erroneous, we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard. Here the question is, how would a reasonable juror understand the instruction. In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. Finally, we determine whether the instruction, so understood, states the applicable law correctly." (*People v. Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218]; accord, *People v. Kelly* (1992) 1 Cal.4th 495, 525–526 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

"Every person who, with knowledge that a person is a minor, . . . knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet . . . or a commercial online service, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and *with the intent, or for the purpose of seducing a minor*, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail." (Pen. Code, § 288.2, subd. (b), italics added.)

The Attorney General agrees with defendant that the statutory element of "the intent, or for the purpose of seducing a minor" requires an intent by the perpetrator to *engage in a sexual act with the minor*. The only case that has considered the meaning of this element is *People v. Hsu* (2000) 82 Cal.App.4th 976 [99 Cal.Rptr.2d 184]. *Hsu*'s appeal challenged this intent element as unconstitutionally vague on the ground that "seducing" was not defined. (*Hsu*, at p. 992.) The court very briefly rejected his challenge. "Although 'seduce,' as *Hsu* notes, can mean simply 'to lead astray,' it is also defined as 'persuading into partnership in sexual intercourse.' (Webster's 3d New Internat. Dict. (1981) p. 2054.) In the context of section 288.2, subdivision (b), with its references to gratifying lust, passion, and sexual desire, people of ordinary intelligence [citation] would readily understand 'seducing' as used here to mean the latter definition." (*Hsu*, at p. 992.)

█ We agree with *Hsu* that, as used in Penal Code section 288.2, subdivision (b), the word "seducing" was not intended to have the vague meaning of "lead[ing] astray" (Webster's Collegiate Dict. (10th ed. 1999) p. 1057) but to have the precise meaning of "carry[ing] out the physical seduction of: entic[ing] to sexual intercourse." (Webster's Collegiate Dict. (10th ed. 1999) p. 1057.) And, in this context, "sexual intercourse" clearly refers to "intercourse involving genital contact between individuals" rather than "heterosexual intercourse involving penetration of the vagina by the penis." (Webster's Collegiate Dict. (10th ed. 1999) p. 1074.) Thus, the "seducing"

intent element of the offense requires that the perpetrator intend to entice the minor to engage in a sexual act involving physical contact between the perpetrator and the minor. Intending to entice a male minor to masturbate himself does not satisfy this "seducing" intent element of Penal Code section 288.2, subdivision (b).

The next question is whether the trial court's instructions, taken as a whole, properly informed the jury of the scope of Penal Code section 288.2, subdivision (b)'s "seducing" intent element. The Attorney General insists that the instructions were not reasonably likely to lead a reasonable juror to believe that the "seducing" intent element could be satisfied by evidence that defendant intended to entice "Scotty" and "Ryan" to masturbate. The Attorney General's position is difficult to reconcile with the instructions as a whole, particularly in light of the prosecutor's argument to the jury. The jury was told that "the word 'seduce' means persuading one into sexual intercourse *or other sexual activity, not mere discourse*." (Italics added.) While "sexual *activity*" was not defined, the jury *was given* a definition of "sexual *conduct*" that explicitly included "masturbation" that was "performed alone." The prosecutor also explicitly argued to the jury, "I don't have to prove the contacts *or the intent to contact*." (Italics added.) Instead, the prosecutor told the jury that the "seducing" intent could be proven by evidence of defendant's intent to "get this other person to submit to a sexual act, *masturbation*, oral copulation, anal sex . . . ." (Italics added.) In addition, the jury's inquiries suggested that the jurors did understand the instructions to permit the "seducing" intent element to be based on an intent to entice "Scotty" and "Ryan" to masturbate alone. The jury's question as to whether it needed to "see confirmation (in text) on 'Scotty' or 'Ryan's' part that 'they' were persuaded 'into' a sex act" or that " 'Scotty or Ryan' told the defendant they did the act" could only have referred to masturbation since that was the only "act" that "Scotty" or "Ryan" ever mentioned having performed.

The Attorney General argues that no reasonable juror would have understood the instructions to permit the "seducing" intent element to be based on an intent to entice a minor to masturbate because such an intent "would be subsumed" by the other intent element of the offense. Not so. The other intent element of the offense may be satisfied by proof that the perpetrator acted "with the intent of arousing, appealing to or gratifying the lust or passions or sexual desires of that person or of the minor." The perpetrator may act with this intent even if the perpetrator does not intend to entice the minor to perform any sexual act, even masturbation. The perpetrator may simply intend to arouse the minor without enticing the minor to perform any act or the perpetrator may be solely concerned with the perpetrator's arousal. We do not believe that reasonable jurors would believe that the "seducing" intent element was "subsumed" by the "arousing" intent element if they believed

that the "seducing" intent element could be satisfied by proof that the perpetrator intended to entice the minor to masturbate alone.

■ Our consideration of the trial court's instructions as a whole leads us to the conclusion that it is reasonably likely that the jury understood the court's instruction on the "seducing" intent element to permit it to base the "seducing" intent element on proof that defendant intended to entice "Scotty" and "Ryan" to masturbate alone. Since such proof cannot properly support the "seducing" intent element, the instruction on the "seducing" intent element was erroneous.

The only remaining question is whether the erroneous instruction was prejudicial. We are unconvinced by the Attorney General's assertion that any error was harmless. The Attorney General contends that this error should be reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] rather than the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. We disagree. An "instructional error that improperly describes or omits an element of an offense . . . falls within the broad category of trial error subject to *Chapman* review." (*People v. Flood* (1998) 18 Cal.4th 470, 502–503 [76 Cal.Rptr.2d 180, 957 P.2d 869].) The trial court's instructional error here "improperly describe[d]" the "seducing" intent element of the offense. Hence it was subject to *Chapman* review.

The trial court's error cannot survive *Chapman* review as the record does not demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*People v. Harris* (1994) 9 Cal.4th 407, 424 [37 Cal.Rptr.2d 200, 886 P.2d 1193].) Defendant admitted that he had intended to entice "Scotty" and "Ryan" *to masturbate*. However, it was hotly contested at trial whether he ever intended to meet with them and have physical contact. He repeatedly deferred or rejected "Scotty's" suggestions that they meet. His entire defense at trial was that his conversations with "Scotty" and "Ryan" were "fantasy" and "entertainment" rather than preludes to physical contact. While the prosecution presented a strong case, we are not convinced beyond a reasonable doubt that the trial court's instructional error did not contribute to the jury's verdict. Consequently, reversal is required.

## B. Other Issues

Although we must reverse defendant's convictions due to the prejudicial instructional error on the "seducing" intent element, we consider defendant's other claims of instructional error for the guidance of the trial court on retrial. Because we reverse the judgment and remand for a possible retrial, it would be premature for us to address defendant's claim that the sentence imposed by the trial court was cruel and unusual.

## 1. Instruction Defining "Harmful Matter"

Defendant asserts that the trial court's instruction defining "harmful matter" was erroneous. Penal Code section 288.2, subdivision (b) prohibits the distribution of "any harmful matter, as defined in Section 313, to a minor" with the requisite intents. (Pen. Code, § 288.2, subd. (b).) Penal Code section 313, subdivision (a) contains a definition of "harmful matter." " 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." Penal Code section 313, subdivision (a)(1) provides that, "[w]hen it appears from the nature of the matter or the circumstances of its dissemination, distribution or exhibition that it is designed for clearly defined deviant sexual groups, the appeal of the matter shall be judged with reference to its intended recipient group."

The jury was instructed with the general definition of "harmful matter" in Penal Code section 313, subdivision (a). The jury was not informed of the special definition in Penal Code section 313, subdivision (a)(1). Defendant claims that the trial court should have instructed the jury with the special definition in Penal Code section 313, subdivision (a)(1) because "the nature of the matter or the circumstances of its dissemination, distribution or exhibition" in this case demonstrated that the "matter" was "designed for clearly defined deviant sexual groups."

This contention lacks substantial support in the record. Defendant sent pornography to and engaged in explicit sexual discussions with persons who he believed were young boys. The circumstances of his distribution of this "material" did not indicate that these fictitious young boys were part of any "clearly defined deviant sexual groups." All defendant knew about the recipients of this material was that they were young gay boys who had made at least one visit to a gay male chat room. Defendant urges that his distribution of this material was to a "deviant sexual group" because it arose from contacts made in a gay male chat room on the Internet. This ignores the fact that none of the charged acts were based on communications *within a chat room* but instead on personal messages sent to recipients who had already identified themselves as young gay boys. Since even young gay boys who occasionally visit gay male chat rooms are not part of a "clearly defined deviant sexual group," the trial court was not required to give the special definition of "harmful matter" in this case.

## 2. Failure to Instruct on Lesser Offense

Defendant contends that the trial court should have instructed on the lesser offense of attempted misdemeanor distribution of harmful matter in violation of Penal Code section 313.1, subdivision (a) (hereafter the misdemeanor). He claims that this lesser offense is a necessarily included offense of attempted distribution of harmful matter in violation of Penal Code section 288.2, subdivision (b) (hereafter the wobbler). The Attorney General claims that the misdemeanor is not necessarily included within the wobbler.

"[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) "[T]he trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." (*Birks*, at p. 118.)

We first examine the statutory elements of the wobbler and the misdemeanor to determine whether the wobbler may be committed without necessarily committing the misdemeanor.

"Every person who, with knowledge that a person is a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet . . . or a commercial online service, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail." (Pen. Code, § 288.2, subd. (b).) The five elements of the wobbler are (1) distribution by electronic mail, the Internet or a commercial online service, (2) of "any harmful matter," (3) to a minor, (4) with knowledge that the person is a minor, and (5) with both of the requisite specific intents.

We must compare the five elements of the wobbler to the elements of the misdemeanor. "Every person who, with knowledge that a person is a minor,

or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly sells, rents, distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter to the minor shall be punished as specified in Section 313.4." (Pen. Code, § 313.1, subd. (a).) The four elements of the misdemeanor are (1) distribution "by any means," (2) of "any harmful matter," (3) to a minor and (4) with knowledge that the person is a minor or with a lack of reasonable care in ascertaining the minor's true age.

The wobbler necessarily requires that the perpetrator distributed harmful matter to a minor with knowledge of the person's minority. The Attorney General nevertheless claims that the misdemeanor is not necessarily committed when the wobbler is committed because distribution over the Internet is *not* distribution "by any means." We cannot credit this argument. Penal Code section 288.2 currently contains two subdivisions that separately outlaw distribution of harmful matter *over the Internet* and distribution of harmful matter *by any means*, but this differentiation must be considered in context. When Penal Code section 288.2 was enacted in 1989, it outlawed distribution "by any means" with the requisite intents. At that time, Penal Code section 313.1 similarly outlawed distribution "by any means" but did not require specific intent. In 1997, the Legislature amended Penal Code section 288.2 to add a separate subdivision outlawing Internet distribution with the requisite intents. The offense was otherwise identical to the offense that had originally been outlawed by Penal Code section 288.2. The Legislature did not amend Penal Code section 313.1. We do not understand this amendment to have changed the meaning of Penal Code section 313.1 so as to preclude that statute from applying to Internet distribution of harmful matter without specific intent. The plain language of the statute, "by any means," clearly includes distribution by means of the Internet.

It necessarily follows that the misdemeanor offense described in Penal Code section 313.1 is a lesser included offense of the wobbler offense described in Penal Code section 288.2, subdivision (b), and the trial court was obligated to instruct on the misdemeanor offense if there was substantial evidence that defendant was guilty only of the misdemeanor. The evidence presented at trial raised a substantial question as to whether defendant actually harbored the specific intent to seduce "Ryan" or "Scotty." Defendant essentially admitted all of the other elements of the offenses. Reasonable jurors could have concluded that defendant distributed harmful matter to

"Ryan" and "Scotty" believing that they were minors and harbored the intent to arouse himself or them but lacked the intent to have any physical contact with them. Such a conclusion is consistent with guilt of only the misdemeanor rather than the wobbler offense.

The Attorney General contends that instructions on the misdemeanor offense were not required sua sponte because the misdemeanor offense was time-barred.[15] Even if we assume that the misdemeanor offense would have been time-barred, defendant could still obtain instructions on the necessarily included misdemeanor offense by requesting such instructions and waiving the statute of limitations.[16] (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 373 [58 Cal.Rptr.2d 458, 926 P.2d 438].) At any retrial, the trial court should consider whether misdemeanor charges would be time-barred as to any of the nine counts, and it *must* instruct on the misdemeanor as to any counts where the misdemeanor would not be time-barred. Defendant may obtain instructions on the misdemeanor as to any counts that the trial court determines would be time-barred by waiving the statute of limitations as to those counts.

### 3. CALJIC No. 2.50.01

Defendant claims that the 2000 version of CALJIC No. 2.50.01 violated his right to due process. In *People v. Reliford* (2003) 29 Cal.4th 1007 [130 Cal.Rptr.2d 254, 62 P.3d 601], the California Supreme Court upheld the 1999 version of CALJIC No. 2.50.01 but recommended that juries be instructed with the 2002 version of CALJIC No. 2.50.01. (*Reliford*, at p. 1016.) On retrial, the trial court should accept this recommendation and instruct with the 2002 version of CALJIC No. 2.50.01.

---

[15] A prosecution for a misdemeanor offense "shall be commenced within one year after commission of the offense." (Pen. Code, § 802, subd. (a).) A prosecution "is commenced when any of the following occurs: [¶] (a) An indictment or information is filed. [¶] . . . [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (Pen. Code, § 804.) The record before us reflects that Clough obtained an arrest warrant no later than February 8, 2000. Only two of the nine counts of which defendant was convicted occurred prior to February 8, 1999. Of course, since the trial court has never passed on the statute of limitations issue, the question of when the period commenced to run may be addressed on a fuller record upon remand.

[16] Because we remand for possible retrial, it is not necessary for us to address defendant's assertion that his trial counsel was ineffective because he failed to request instructions on the misdemeanor offense.

## III.   Disposition

The judgment is reversed.

Elia, Acting P. J., and Wunderlich, J., concurred.