Filed 10/11/13  P. v. Udall CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>TODD DOUGLAS UDALL,<br><br>  Defendant and Appellant. | F063220<br><br>(Super. Ct. No. F09905537)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Todd Douglas Udall guilty of two counts of contacting or attempting to contact a minor with intent to commit a lewd act (Pen. Code, § 288.3,

subd. (a)),[1] one count of providing harmful matter to a minor for sexual purposes (§ 288.2, subd. (a)), and two counts of attempting to provide harmful matter to a minor for sexual purposes (§§ 664, 288.2, subd. (a)). He was sentenced to three years eight months in prison.

In this appeal, Udall contends that: (1) the trial court erred by failing to instruct the jury sua sponte on section 313.1, subdivision (a), as a lesser-included offense of section 288.2, subdivision (a); (2) alternatively, section 654 precludes punishment for violation of section 288.2 in addition to the punishment imposed for violation of section 288.3 because the two offenses were part of a continuing course of conduct with a singular intent and objective; (3) the trial court abused its discretion by not considering probation and local time as a viable alternative to state prison; (4) he is entitled to additional presentence conduct credit under equal-protection principles; and (5) the abstract of judgment must be corrected to reflect the factual basis for counts 1 and 2.

We order the trial court to amend the abstract of judgment to describe the crimes underlying counts 1 and 2 accurately. In all other respects, we affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORIES

During the relevant time period in 2009, Julia W. was 13 years old and living in Fresno County with her grandfather. She met the Udall family—defendant, his wife (Wife), and their 11-year-old daughter (Daughter)—through church. Daughter and Julia were friends, and Julia was "friends" on Facebook with Daughter, Wife, and Udall.

In September 2009, Julia's grandfather reported to the police that Julia had received inappropriate messages from Udall. Julia told a police officer that she had conversations with Udall through Facebook that made her extremely uncomfortable. The police later logged into Julia's Facebook account and engaged in Internet communications with Udall while pretending to be Julia.

---

[1]Subsequent statutory references are to the Penal Code.

As a result of the police investigation, Udall was charged with six counts: (1) contacting or attempting to contact a minor with intent to commit a lewd act upon the child in violation of section 288.3, subdivision (a), on September 18, 2009; (2) violation of section 288.3, subdivision (a), on September 19, 2009; (3) arranging a meeting with a minor for the purpose of engaging in lewd or lascivious behavior in violation of section 288.4, subdivision (a)(1), on September 18, 2009; (4) providing harmful matter to a minor for sexual purposes in violation of section 288.2, subdivision (a), on September 17, 2009; (5) attempting a violation of section 288.2 on September 18, 2009; and (6) attempting a violation of section 288.2 on September 19, 2009.[2]

A jury trial began on May 10, 2011. Julia testified that Daughter was her good friend and she had spent a lot of time with both Daughter and Wife, visiting their house twice and spending the night on one occasion. Julia also joined Daughter's family, including Udall, on a trip to Shaver Lake on September 7, 2009.

Julia first communicated with Udall by instant chat to ask about the Shaver Lake trip. Julia explained that instant chat on Facebook is a private communication that is not posted on one's Facebook page. She began having instant chats with Udall almost every night. At first there was nothing unusual about her Internet conversations with Udall, but at some point, they became inappropriate and sexual. Julia recalled telling Udall that she was going to a school dance and he said he used to get kicked out of dances for touching girls and he would like to dance with her. Udall told her if she had a boyfriend, he would make her break up with him. Julia reminded Udall that he was married, and he responded that it did not matter and he had cheated before. Udall told Julia she looked like she was

---

[2]The first amended complaint incorrectly describes counts 1 and 2 as "arranging meeting with minor for lewd or lascivious behavior." These factual allegations describe a violation of section 288.4, not section 288.3. The prosecutor, however, clarified that counts 1 and 2 allege violations of section 288.3—contacting or attempting to contact a minor with intent to commit a lewd act—and the jury was correctly instructed on the elements of section 288.3 for those counts.

16 years old in her pictures. He talked about them going on a date when Wife would be at a women's retreat organized by their church. He said they could have sex at his house and he would lick her wherever she wanted. He asked if Julia had had sex before. She said no, and Udall responded, "Good. That is the way I like them." He told her he could make it not hurt. Udall also said that he could meet Julia before he picked up his kids. He said they could meet "in a few days." He talked about meeting Julia after his son's soccer games and discussed having sex in his house. Julia deleted her instant chats with Udall because he told her it would be better as "neither of us would get in trouble."

Julia told her grandfather about her Facebook conversations with Udall, and he contacted the police. Udall also asked Julia for her cell phone number and began sending her text messages; on September 18, 2009, he sent her more than 50 messages. Julia told her grandfather about the text messages, and he again notified the police.

Police Officer Abby Padgett testified that she was dispatched to Julia's grandfather's house on Thursday, September 17, 2009, to investigate the grandfather's initial report. Padgett spoke with both Julia and her grandfather. Julia told Padgett that she had been having instant chat conversations with Udall for the previous couple months; initially, they talked about school and normal activities. Then, about two weeks earlier, Udall told Julia he loved her. The day before Padgett interviewed her, Julia had an Internet conversation with Udall that lasted two to three hours and they had another long conversation on September 17 as well. Julia told Padgett that Udall said he wished he was 14 again so he could dance with her. At some point in the conversation, Julia became extremely uncomfortable and started responding with "oh" and "okay." Udall told her he wanted her really bad and they should see each other alone. He mentioned the possibility that they could go to the movies on Saturday. He said he could probably get his kids out of the house and they would be able to meet. Udall asked Julia if she was alone in her room while they were chatting; he said they could get in trouble if anyone found out about their conversations and he could lose her.

4.

Padgett also described many of Udall's statements that Julia testified about. For example, Padgett testified that Julia told her Udall said he had been kicked out of a school dance for touching girls and he would make her break up with her boyfriend. He said he had cheated before. He told Julia they could have sex at his house and he would lick her wherever she wanted and do whatever she wanted. Udall asked her if she had had sex before, and when she said no, he said, "Good. That's the way I like them." Padgett did not see any of the Facebook conversations that Julia described as Julia told her she had deleted them.

Police Officer Kory Westbury testified that he continued the investigation, visiting Julia's grandfather's house the next day. Julia told Westbury that Udall had sent her text messages on her cell phone while she was at school that day. There had been so many messages that she had been sent to speak with a counselor about using her cell phone in school. In these text messages, Udall discussed being alone with Julia and doing whatever she wanted.

Photographs of Julia's cell phone text messages were admitted into evidence. Julia's text messages to Udall were not available, however, because she deleted her own outgoing text messages. Udall texted, "I do not know yet, but I hope soon," "[f]igure a time and place to be together," "find a time and place to be alone," "[j]ust be with you and make you happy," and "a full day or more together." Julia sent a text asking Udall what they would do, and he texted back, "Anything you ask." He wrote, "I love your smile. I could look at it all day long. You make me laugh and that makes me happy." He wrote, "This is my first time to want to do this," "want to be with you," and "[b]ut I want to so badly." Udall texted that he wanted to do whatever Julia wanted, he wanted to know what would make her happy, and he wanted "to be with [her] a lot." He texted, "I love talking with you. I also want to do the stuff we talked about last night." Julia and Udall exchanged texts discussing what they would do together. Julia asked what Udall liked, and he responded, "Wow. I love it all so much oral and everything."

5.

The police decided to log into Julia's Facebook account and conduct an instant chat with Udall using her grandfather's computer. At 9:15 p.m. on September 18, 2009, Udall attempted to instant chat with Julia, and Westbury responded, pretending to be Julia. Westbury saved a copy of the chat session, and a transcript of the conversation was admitted into evidence.

During the Internet conversation, Udall wrote, "I was just thinking I wish my family would go out of town for a weekend." Westbury (as Julia) asked why, and Udall responded, "so it would be easier for us to hook up." Udall said that Julia could come over and "we could have fun," "maybe swim at night." Westbury wrote it would be cold, and Udall responded, "there are ways to stay warm" and "share body heat." Westbury suggested they could watch movies. Udall said, "we can get anything you want from on line." Westbury asked what Udall thought, and he responded, "something with sex in it."

Later in the conversation, Westbury asked, "What would you do if you saw me right now?"[3] Udall responded, "Kiss you and hug you." Westbury asked Udall what he would want to do. Udall wrote that he wanted to get in bed with Julia, remove her clothes, and "rub my hand all over your body kiss you everywhere." He said he would kiss "breast tummy a little lower," "between your legs," and "your pussy." Westbury asked, "And then do what?" Udall wrote, "If you want, climb on top of you," and "maybe put it inside you." Udall continued, "I want to so badly" and "I am so crazy for you." He wrote, "I will go very slow[.] I don't want to hurt you at all." He also asked, "where do you want me to cum" and said, "if you want to take chances in you [otherwise] pull out." Udall said he was "a little worked up" and his "you know is hard."

---

[3]The transcript of the chat session shows Westbury typed, "wht wld u do if u saw me rt now." Westbury explained that he wanted to make sure he responded the same way Julia communicated online. Julia testified that she told the police how she typed in a shorthand manner, shortening some words and, for example, typing "OIC" for the phrase, "oh, I see."

6.

Westbury told Udall, "My grandpa is leaving tomorrow. We can meet at the park, if you want to." Udall responded, "that would be kool I will text you when I can get away," "maybe around 4ish." Westbury asked what Udall wanted to do. He responded, "kiss you if we are alone." Westbury asked where they could go, and Udall wrote, "hmmm we will see maybe for a ride." Westbury asked what Udall wanted to do, and Udall responded, "everything." Udall continued, "I like you so much I do not want this to be just about sex and I am new to doing this," "I looked at your pics 100 times today," and "I think I love you." He wrote that he had a great feeling in him and felt "warm not hot I feel great almost like I am floating." Westbury asked, "Like the dance when you were 14?" and Udall responded, "yea but way better."

Westbury asked how Udall was going to get away the next day. Udall wrote, "I will have to try to work on that," "I will try I promise I will try," and "I do not want to make a promise and something go wrong and have to break it." He wrote, "it hurts that I just cant run off to see you." Udall said he would work on a way to get away from everyone to meet Julia at the park. He explained that he was a coach and he would know whether he could get away and meet Julia after the second game and he would text her. Udall wrote that he would think about Julia just like last night. He said he dreamed about her—"I remember you and I were together and everyone thought it was a good thing." He said it was a good thing "as long as we do not get caught." The instant chat session ended at 11:02 p.m.

The next day, police set up a surveillance team to observe Udall and the park where he discussed meeting with Julia, but Udall did not go to the park. Westbury testified that Udall drove by the park. That evening, September 19, 2009, Westbury logged into Julia's Facebook account and engaged in another instant chat session with Udall while posing as Julia. Westbury copied the conversation and a transcript was admitted into evidence.

Udall wrote that he had been called in for work that day because a drunk driver hit a power pole. He worked for PG&E. He said he hoped Wife would go to the women's retreat so Julia and he could see each other. He wrote, "this will be my first time cheating." Westbury asked if Udall still wanted to see Julia. Udall responded, yes, but he was scared that he would want more than he could have; he said, "what if I want to be with you more than my family its not like I can leave them and marry you." He asked if he should wear protection. Westbury responded that it was up to him. Udall wrote that he wanted to wrap his arms around Julia and hold her tight and he would take his time and go slow. He said she would learn what she liked, such as "kissing your body in def places," "neck breast back tummy legs and any other spot you maybe curious about." He mentioned "kissing/licking" "breast pussy butt." He suggested that Julia spend a night with Daughter and then she could sneak out of her room and into his bed.

Udall asked whether he needed to buy protection. He said he would only want Julia to get pregnant "if I thought there was a way for us to be married." Later, Westbury wrote that he (as Julia) was scared, and Udall wrote, "ok if you want to back out its ok, we are friends and I will not ever get mad." He wrote, "lets try for womens retreat." Udall said that, the day they went to the lake, he had been scared to look at her because he was scared everyone could see what he was thinking—that she was sexy and he wanted to kiss her. Again, Udall asked whether Julia wanted him to use protection and whether she wanted him to "sho[o]t it in you." This Facebook chat session began at 8:48 p.m. and ended at 11:06 p.m.

On September 23, 2009, Westbury arrested Udall. He examined Udall's cell phone and confirmed that he had been texting Julia. Westbury interviewed Udall in the police department's investigation room. The interview was videotaped, and a DVD of the interview was played for the jury.

In the interview, Westbury explained there had been a report of inappropriate conversations over the Internet. Initially, Udall said that Julia started the inappropriate

8.

conversations with him on Facebook and he was only trying to scare her. He said, "I should [have] gone to her grandfather instead of trying to scare the tar out of her." He described Julia as "kind of the, I, you know gets in trouble a lot type kid." Udall said Julia did not live with parents and he had heard her father was in prison. He told Westbury that she asked specific questions about sex and "I said no you don't want to do this it hurts." One day Julia told him she loved him and then she started to talk about meeting him. She wanted to meet Udall at the park but he did not go. He said they had exchanged text messages, "it went back and forth ten times each."

Later in the interview, Udall admitted that he told Julia he wanted to do things sexually with her. Westbury asked why he would do that if his purpose was to scare her, and Udall responded, "Things got twisted around." He said he "blew it" and admitted he had sexual conversations with Julia on Facebook on the nights of September 18 and 19, 2009, but before that, their conversations were not inappropriate. He told Westbury, "I got roped in," "[b]ut I, I quickly got out." Westbury asked whether, during his conversations with Julia, Udall thought this could be a possibility. Udall responded that he "[g]ot into dreamland about it but reality is I knew I could never, would never." "I mean in my own mind but not communicated it you know but then you stop and say [wait] a minute here we're talking a thirteen year old girl no."

Udall said he and Julia talked about going to Magic Mountain or Disneyland, and he mentioned that Wife goes to a women's retreat and leaves him with the kids, but he made no set dates. He reiterated that he did not meet Julia at the park, stating, "I was at my office and there was no way I [was] going to the park." He explained that he planned to work that day and "that was kind of a reinforcement to make sure …." Westbury asked, "Were, were you tempted to meet her?" Udall responded, "To be honest with you yeah … [¶] … [¶] I was but … [¶] … [¶] I would not that's over an internet not seeing the person .… [¶] … [¶] I know I would not cross that line." He continued, "Sitting on the internet on the couch middle of dark you know middle of the night not looking at a

9.

picture of the person not seeing the person is like a dreamland type thing[,] but to do it[,] no way."

Westbury asked if Udall had had a similar "situation" on the Internet with anyone else. Udall responded he had some cybersex-type conversations on Yahoo Messenger and "that's been my vice I've been trying to break." He said he had "done this stuff before" but he "never ever met anybody never will meet anybody." Among other Internet contacts, Udall said he had sexually related chats with a 14-year-old girl during the summer. He said he had stopped, but "then [Julia] popped up and I made a mistake." Westbury eventually told Udall that he had been chatting with him, not Julia, the previous Friday and Saturday nights. Later in the interview, Udall said, "I admit I was very dumb you know I let this get out of control and I should have not done it …. I'm guilty of letting it get out of control …. I'm glad nothing physically happened.… And nothing would have and I won't."

At the end of the interview, Westbury gave Udall an opportunity to write an apology letter. Udall wrote an apology letter to Julia's grandfather, which was admitted into evidence. Udall wrote, in part: "Your granddaughter and I started off chatting. It was just normal stuff, and then went out of control. I made a mistake, and did not stop it. I allowed it, and then encouraged it. I am so ashamed right now. At that point in my mind I was talking to a fantasy computer, not a person." He wrote that he would pray to God that this will never happen again.

Dustin Dodd, a police officer and computer forensic analyst, testified that he executed a search warrant of Udall's home and seized two computers and an external hard drive. On Udall's laptop computer, Dodd found a Yahoo Messenger profile and "images depicting sexual exploitation of children" in a folder associated with that profile. There was data showing that the Yahoo Messenger profile visited various chat groups and engaged in chats with other users whose profiles "were all names of people who purported to be younger minors." Dodd explained that profile names may include a year

10.

of birth. For example, a user profile name of "BRIW1996" would imply the user was around 13 years old in 2009.

Dodd recovered "hundreds and hundreds" of chat logs from before June 2009 to August 11, 2009. In the chat sessions, the Yahoo Messenger profile associated with Udall's computers would tell others his age, sex, location, and sometimes would say he worked for PG&E. Typically, within four or five messages, the conversations would become sexually explicit. Dodd testified that Udall "would talk about things that he would want them to do if they had met up or things he would want to do to them; how experienced they were sexually, and things like that." For example, Udall engaged in a chat with "Simba," who said he was 13 years old and from Georgia. Udall asked Simba, "What do you like to do with a guy?" and Simba responded "Be the girl …." Udall wrote to Simba, "Would I get to lick you?" and "I want to suck you and FUCK you." Dodd testified there were several hundred chat logs "that were just like this." In one chat log, Udall chatted with a person who identified herself as a 14-year-old girl. Udall wrote, "I really get turned on by girls your age."

There were also logs showing Udall requesting, offering, distributing, and looking at sexual images of minors. Dodd found many pornographic images involving children on Udall's computers. These included "a black-and-white photo of roughly an eight-to ten-year-old female completely nude with an adult male inserting his penis into her vagina," a "color image of a young female, approximately eight to ten years old, wearing panties, lifting up her top and pinching her nipples for the camera," and an image of a girl approximately 10 to 12 years old with semen on her face. On cross-examination, Dodd testified that he found more pornographic images of adults than of children on Udall's computers.

Udall's former supervisor, Daughter, and Udall himself testified for the defense. James Redman, Udall's former supervisor at PG&E, testified that Udall worked four hours of scheduled overtime on Saturday, September 19, 2009, from 4:00 p.m. to 8:00

11.

p.m.  The work did not involve an emergency such as a drunk driver running into a power pole.  Redman described Udall as "[a] very honorable employee, very conscientious" and "truthful and honest."

Daughter testified that she met Julia at church; Julia's grandfather was a pastor at the church.  She never saw her father look at Julia or any of her friends in a weird or inappropriate way.  She thinks her father is very truthful and "teaches [her] right from wrong …."  Daughter spent about 60 days or more in the hospital in 2007, and her father would spend the night at the hospital with her.  She said he was like her best friend.

Udall testified that he began visiting chat rooms in September 2007 when Daughter, who had first been diagnosed with leukemia in 2005, relapsed.  At that time, he "really got mad at God."  He was told that the treatment for Daughter was not working and they had the choice of making her comfortable and letting her die or trying radical treatments.  A nurse at the hospital suggested online chat rooms as a way of dealing with Daughter's illness.  He explained:  "I went to the chat rooms, because I wanted [to] escape my reality.  When I was in them, I wasn't Todd Udall, married, two kids.  I was Todd Udall single, no children.  I lived in Santa Cruz, California.…  I was in my 30s; looking for a different life and—escaping my reality."

Udall admitted that he chatted online with people who purported to be 14 years old and as young as 11 and 12 years old.  People would sometimes send him pornographic pictures of children, but he would delete them.  He was not looking for photos; he "was seeking chat."  He admitted that he wrote, "I really get turned on by girls your age" to a person who said she was 14 years old.  He joined chat groups that had names such as "youngnudegirlsonly," "1800gotlolitas," and "schoolgirlcuties."  Udall admitted that his chats were about having sex with children, but he denied that it was his fantasy to have sex with children.

Udall's church suggested all the members become Facebook friends, and that was how Julia became his friend on Facebook.  Julia's grandfather also approached Wife and

asked the family to befriend Julia because she had a rough childhood and she needed good friends.

Udall testified that his first Internet conversation with Julia of a sexual nature occurred on Thursday, September 17, 2009. That night, Udall and Wife had a "pretty big argument over finances …." They had one particular medical bill that was $124,000 and their insurance companies did not want to pay it. Other bills were also stacking up. Udall began chatting with Julia on Facebook and told her about the fight. Julia said if she were his wife, they would not have fights like that. Udall wrote that he was old, and Julia told him he looked young. He testified, "She started saying things just kind of making me feel good." He admitted that he talked about going to the movies, asked Julia if she were a virgin, and started talking about having sex. He viewed his conversations with Julia like his Yahoo Messenger chats, as an escape from reality. Udall said it was Julia who asked him to text her, but he admitted that he sent her texts about sex on Friday, September 18, 2009, and specifically texted about finding a time and place to meet. Asked why he would text a 13-year-old girl about sex, Udall responded, "Wish I wasn't. I just got caught up in the moment."

Udall discussed meeting Julia at a park, but he had no intention of meeting her. He only wrote that he would try to meet her, and he never planned to meet her. Udall testified that, during all the Facebook conversations and text messages of September 17, 18 and 19, 2009, he never intended to meet Julia for the purpose of having a sexual relationship. On cross-examination, Udall said he knew the women's church retreat was sometime in October 2009 at Hume Lake.

The jury found Udall guilty of counts 1, 2, 4, 5, and 6. The jury found Udall not guilty of count 3, arranging a meeting with a minor for the purpose of engaging in lewd or lascivious behavior.

The trial court sentenced Udall to state prison for a total term of three years eight months, consisting of the middle term of three years for count 1, plus a concurrent middle

13.

term of three years for count 2, plus a consecutive term of eight months (one-third the middle term of two years) for count 4. The court stayed the sentence for counts 5 and 6 pursuant to section 654.

## DISCUSSION

### I. Jury instructions

Udall contends the trial court erred by failing to instruct sua sponte on section 313.1, subdivision (a), as a lesser-included offense of section 288.2, subdivision (a), the charged offense of counts 4, 5, and 6.

Section 288.2, subdivision (a), makes it a crime for a person to knowingly send, distribute, or exhibit any harmful matter[4] to a minor "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor .…"

Section 313.1, subdivision (a), makes it a misdemeanor to knowingly sell, rent, send, distribute, or exhibit harmful matter to a minor. We assume section 313.1, subdivision (a), is a necessarily included lesser offense[5] of section 288.2, subdivision (a). (See *People v. Jensen* (2003) 114 Cal.App.4th 224, 244 [§ 313.1, subd. (a), is lesser-included offense of § 288.2, subd. (b), sending harmful matter by electronic mail, Internet, or online service to minor with intent to seduce] (*Jensen*); *People v. Nakai*

---

[4]"Harmful matter" is defined in section 313, subdivision (a), as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

[5]"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117-118.)

14.

(2010) 183 Cal.App.4th 499, 507 [assuming without deciding that § 313.1, subd. (a), is necessarily included offense of § 288.2, subd. (a)] (*Nakai*).)

A trial court must give an instruction on a lesser-included offense sua sponte if the evidence warrants the instruction. (*People v. Cook* (2006) 39 Cal.4th 566, 596.) The evidence warrants the instruction if there is substantial evidence which, if accepted, would absolve the defendant of the greater offense, but not the lesser. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) We review de novo the court's instructions on lesser-included offenses. (*People v. Cook*, *supra*, at p. 596.)

Two published cases addressing this issue are instructive. In *Jensen*, *supra*, 114 Cal.App.4th 224, the defendant engaged in many sexually explicit chat sessions with, and sent pornographic pictures to, "Scotty" and "Ryan," the online profiles for two fictitious 13-year-old boys that had been created by two police officers. (*Id*. at pp. 227-234.) At trial, the defendant's attorney argued that, for the defendant, this was fantasy and entertainment but "there 'was no indication whatsoever that he ever intended to meet these boys.'" (*Id*. at p. 238.) The defendant was convicted of nine counts of attempted distribution or exhibition of harmful matter to a minor over the Internet with intent to seduce (§§ 664, 288.2, subd. (b)). (*Jensen, supra,* at p. 226.) On appeal, he argued the trial court should have instructed the jury on the lesser offense of misdemeanor distribution of harmful matter in violation of section 313.1, subdivision (a). (*Jensen, supra,* at p. 243.) The Court of Appeal agreed, explaining:

> "The evidence presented at trial raised a substantial question as to whether defendant actually harbored the specific intent to seduce 'Ryan' or 'Scotty.' Defendant essentially admitted all of the other elements of the offenses. Reasonable jurors could have concluded that defendant distributed harmful matter to 'Ryan' and 'Scotty' believing that they were minors and harbored the intent to arouse himself or them but lacked the intent to have any physical contact with them. Such a conclusion is consistent with guilt of only [section 313.1, subdivision (a)] rather than [section 288.2]." (*Jensen*, *supra*, 114 Cal.App.4th at pp. 244-245.)

15.

In *Nakai*, *supra*, 183 Cal.App.4th at pages 501-502, the defendant engaged in sexual online chats with Colleen, a woman posing as a 12-year-old girl living in Riverside, California. He sent her a picture of his erect penis and, among other things, asked her if she would suck his dick and if she would like to "ride on it." (*Id*. at p. 502.) Colleen told the defendant he could come to her house that Saturday at 6:00 p.m. He asked for her address, and she gave him the address of a house where the Riverside County Sheriff's Department was planning an "'Internet decoy sexual predator sting.'" (*Id*. at pp. 505-506.) That Saturday, the police found defendant sitting in his car near the sting house at around 3:00 p.m. (*Id*. at p. 506.) He was charged with two counts of attempting to send or exhibit harmful matter to a minor with the intent of seducing the minor.

At trial, his attorney requested instructions on the lesser offense, section 313.1, subdivision (a). (*Nakai, supra,* 183 Cal.App.4th at p. 506.) The trial court denied the request, reasoning that defendant's chat sessions showed his sole intention was to seduce the purported 12-year-old girl with whom he thought he was communicating. The trial court noted that no evidence was presented that defendant harbored a different intent. (*Id*. at p. 507.) The Court of Appeal "agree[d] with the trial court's conclusion that there is no evidence that a reasonable jury could find persuasive that, if accepted, would absolve defendant from guilt of the greater offense but not the lesser, because the evidence only demonstrates defendant's combined intents to arouse and seduce." (*Id*. at p. 508.)

Udall argues that this case is similar to *Jensen*, as there was evidence from which a reasonable jury could find that he had no intention to seduce Julia. The Attorney General responds that this case is more like *Nakai* because Udall's messages to Julia "were tailored toward seducing the victim and getting her to meet him." For example, he talked about going on a date with Julia when Wife was away at a women's retreat. He said he wanted her really bad and he was "so crazy for [her]." He told her he would go slow and

not hurt her. He sent her text messages saying he wanted to know what would make her happy. He told her he dreamed about her and wrote, "I think I love you."

We agree with the Attorney General that Udall's own words are persuasive evidence of his intent to seduce Julia. We cannot, however, ignore Udall's own testimony that he never intended to meet Julia for the purpose of having a sexual relationship. This was arguably evidence from which a jury could find that Udall committed the lesser offense of sending harmful material, but not the greater offense of doing so with the intent to seduce. For this reason, we hesitate to conclude that no instruction on section 313.1, subdivision (a), should have been given in this case.

Even so, Udall's contention fails because we find no prejudice. In a noncapital case, failure to instruct sua sponte on lesser-included offenses that are supported by the evidence is reviewed for prejudice under *Watson*.[6] (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) Thus, "[a] conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Ibid.*) Here, the evidence of Udall's intent to seduce Julia was overwhelming. The only counterevidence was Udall's testimony that, while he enjoyed the fantasy, he never intended to have sex with Julia. Obviously, the jury was not swayed by this testimony.

The jury received its final instructions on the afternoon of May 17, 2011, and deliberated for fewer than 30 minutes. The next day, the jury resumed deliberations at 1:25 p.m. and submitted a question to the court at 4:25 p.m. The jury adjourned for the day at 4:35 p.m. The question related to count 3, arranging a meeting with a minor for the purpose of engaging in lewd or lascivious behavior in violation of section 288.4, subdivision (a)(1).

---

[6]*People v. Watson* (1956) 46 Cal.2d 818, 836.

The next day, the court addressed the jury's question first thing in the morning. The jury resumed deliberations at 9:04 a.m. and notified the clerk it had reached a verdict at 9:35 a.m. In addition to finding Udall guilty of three counts involving section 288.2, subdivision (a), the jury found him guilty of two counts of violation of section 288.3, subdivision (a), contacting or attempting to contact a minor with intent to commit certain felonies (in this case, lewd and lascivious conduct with a minor). This means the jury determined that Udall intended to commit acts with Julia, rejecting Udall's testimony that he had no intention of ever meeting Julia. In light of these proceedings, it is not reasonably probable that Udall would have obtained a more favorable outcome had the trial court given instructions on section 313, subdivision (a).

## II.    *Section 654*

In the alternative, Udall contends that section 654 precludes punishment for count 4 because the evidence discloses this was a continuing-course-of-conduct offense woven together by a singular intent and objective. In other words, he should only be punished once for his various communications with Julia over the span of September 17 through 19, 2009. We reject this contention.

Section 654, subdivision (a), provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"This statute bars multiple punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective." (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.)  Courts recognize, however, that "'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]'" (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935 [citing *People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11, and *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253-1254].)  "This is

18.

particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*Gaio, supra,* at p. 935.)

Here, count 4 relates to Udall's conduct on Thursday, September 17, 2009. No other count relates to Udall's conduct on this day. At the sentencing hearing, Udall's attorney argued that Udall's communications over the three days amounted to "a single period of [aberrant] behavior" and therefore consecutive sentencing was not justified. Udall's attorney did not mention section 654 and did not argue that the sentence for count 4 should be stayed. We consider the issue because section 654 errors may be corrected on appeal regardless of whether the point was raised in the trial court. (*People v. Perez* (1979) 23 Cal.3d 545, 550.)

The prosecutor responded that the separation of time between each day allowed Udall to reflect and nevertheless resume his inappropriate conduct. After hearing the parties' arguments, the trial court commented: "I think—the problematic language is so close in time as to indicate a single period of [aberrant] behavior, though within that period, there was more than sufficient time for the defendant to contemplate his actions."

Later, the court stated:

> "The question then becomes what is the appropriate sentence within the range? I don't think mitigated or aggravated are appropriate. I don't think I have factors for that. I do believe I have sufficient factors for the mid term of three years. Probation recommended four years, eight months. That is running both Counts 2 and [4] fully consecutive. Frankly, I don't think that is necessary either."

In reaching its sentence, the trial court implicitly recognized that Udall could be punished separately for each day's conduct. As the court had observed, within the three days, "there was more than sufficient time for the defendant to contemplate his actions." We discern no error. Each new day gave Udall an opportunity to reflect before deciding to engage in further sexual communications with Daughter's 13-year-old friend, and each

new chat session posed the risk of further harm to the victim. As a consequence, separate punishments for counts 1 and 4 are not barred by section 654.

## III.    *Denial of probation*

Udall next claims the trial court abused its discretion by not considering probation and local time as a viable alternative to state prison in light of the overall factual circumstances of this case and demonstrated likelihood that he would be a good candidate for probation. We reject this claim.

"Probation is generally reserved for convicted criminals whose conditional release into society poses minimal risk to public safety and promotes rehabilitation. [Citations.] The sentencing court has broad discretion to determine whether an eligible defendant is suitable for probation and, if so, under what conditions." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) A defendant bears a heavy burden when attempting to show the trial court abused its discretion by denying probation. (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311.) "'In reviewing [a trial court's determination whether to grant or deny probation,] it is not our function to substitute our judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' [Citation.]" (*Ibid*.) We presume the trial court considered all relevant criteria in deciding whether to grant probation. (*Id*. at p. 1318.)

Criteria affecting the decision whether to grant or deny probation include facts relating to the crime and facts relating to the defendant. (Cal. Rules of Court, rule 4.414.) Facts relating to the crime include, but are not limited to: the seriousness and circumstances of the crime compared to other instances of the same crime; the vulnerability of the victim; whether the defendant was an active participant; and whether the crime was committed because of an unusual circumstance that is unlikely to recur. (Cal. Rules of Court, rule 4.414(a)(1), (3), (6) & (7).) Facts relating to the defendant include, but are not limited to: any prior record of criminal conduct and whether the prior

20.

record indicates a pattern of regular or increasingly serious criminal conduct; willingness to comply with the terms of probation; likely effect of imprisonment on the defendant and his or her dependents; whether the defendant is remorseful; and the likelihood that if not imprisoned the defendant will be a danger to others. (Cal. Rules of Court, rule 4.414(b)(1), (3), (5), (7) & (8).)

In this case, the probation officer's report recommended that Udall be sentenced to a total term of four years eight months.[7] A probation officer had interviewed Udall, who stated that the victim started the sexual talk and told Udall he was cute. Udall had also heard from his attorney that the victim "has done this before with other men." He said he did stupid things, but stated that he was under duress at the time because Daughter had leukemia for five years. Udall was eligible for probation, and the probation officer noted, "[t]o his credit, the defendant is educated, has been employed by the same company for a long period of time, and has a supportive family." In addition, Udall reported that he had enrolled in counseling for sexual addiction at New Creations Ministry while he was out of custody on bond.

Addressing whether Udall was remorseful, the probation officer wrote that, despite admitting he acted irresponsibly, Udall still "put blame on the victim" by saying she initiated the sexual talk and "further distanc[ed] himself from responsibility" when he said Julia had "done this before with other men." Considering the likelihood of danger to others, the officer opined that Udall's "fantasy life was escalating." He had been having inappropriate contact with minors for years and had child pornography on his computers at the time of his arrest. The officer concluded, "Although the defendant does not have a criminal record and scored in the Low Risk category on the Static 99-R, he is not

_____

[7]The probation officer recommended the middle term of three years for count 1, plus one year (one-third the middle term of three years) for count 2 to run consecutively, plus eight months (one-third the middle term of two years) for count 4 to run consecutively. It was recommended that counts 5 and 6 be stayed pursuant to section 654.

21.

appropriate for a grant of probation. Based on the nature and severity of the offenses, the age of the victim, as well as concern for the safety of the community, a prison recommendation is warranted."

At the sentencing hearing, the prosecutor asked the court to impose the probation officer's recommended sentence. He asked the court to consider the victim's vulnerability, noting that she came from a "broken home," and Udall took advantage of the fact that she did not have a strong family support system.

The court then heard letters from Udall and his parents, read by Udall's attorney. Among other things, Udall wrote, "Looking back now, I am seeing a pattern. The more stress I came under, the more I participated in chat rooms. I thought I was only hurting myself and my standing with God. I think now how could I have caused this much pain to the ones that I loved the most, [Wife] and the family." Udall's mother and stepfather wrote that Udall "turned himself against God and himself" when Daughter relapsed. They wrote that he was a strong God-fearing man with "total repentance" and they hoped the judge would allow him to go home to his family, who were eager to accept him.

Wife and a pastor at Udall's church also addressed the court. Wife said she believed very much in her husband and "that he made a mistake in a time of midlife crisis. He did something he regrets." "He understands the errors of [his ways] and he is not trying to get away with something." The pastor stated that he has only known Udall since his arrest, but he vouched for his character.

Udall's attorney argued that Udall was an appropriate candidate for probation because he sought out counseling for sexual addiction on his own. He stated:

> "D[oes] he need to serve three and a half years in prison for this conduct? I don't think he does. I think the reality is that the Court can sentence him to the aggravated term on all of the counts and stay the aggravated term on all the counts, and this is an individual that would actually provide the Court with proof that he could complete his probation for as long as the period of time exists.

"I submit that is not something I would typically say. With this defendant and the time that I have spent with him, I don't believe he is a re-offense candidate. That is the one thing that you really can't put your finger on when you are dealing with a sexual offense. They are very hard to articulate why one would re-offend and one would not.

"The conduct that [he has] taken after being confronted with his crime is conduct that indicates that he is intending on not re-offending, because he is telling people about what he has done. There are people at therapy around him that know what he is accused of. He is also going to groups to be accountable for his conduct."

Udall's attorney raised the variety of stressors in Udall's life—Daughter's cancer, medical bills—and said "he was making bad choices to escape the reality of his life." "He reacted poorly to [Daughter's illness] by escaping. I think that is what it was. It was an escape, because he never intended to follow through on meeting with her, making arrangements to meet with her." He continued:

"Now, [the prosecutor] and I disagree on [whether Udall intended to follow through]. He has his opinion based upon the police reports and the evidence that … was produced .… I have a little more information because I have been dealing with Mr. Udall personally. I have a little based upon what Mr. Udall was doing while he was out of custody after he was convicted, and a little about his personality and what the pressures that he was under."

The prosecutor responded that Udall "continues to blame a 13-year-old child to some degree and [is] not taking entire responsibility, putting blame on a child" and her grandfather, "anyone but himself .…" The prosecutor argued that this was more than just a fantasy in Udall's own head—"it was some degree of infatuation with this child who was extremely vulnerable."

The trial court denied probation. The court explained:

"I have read and considered the probation report. Obviously, being the Court that heard the testimony in this case, I had an ability to evaluate the credibility and the weight of all the evidence. I find there is clearly sufficient evidence to support the verdict.

23.

"This is unfortunately like many of these cases involving individuals that get entwined in the Internet; cases that cause people that from the outside appear to be law abiding, and to quote Mrs. Udall herself, 'Good people do bad things,' but those bad things were intentional in this case.

"[Udall's attorney] noted the thought process leading up to the action and that is what separates those individuals who decide not to commit crimes and those who do. Many people engage in thought processes leading up to actions, and decide not to take those actions. Mr. Udall decided to take the action. The pastor noted Mr. Udall has hope waiting for him. I hope he takes advantage of that. They will welcome him when he is returned, but I don't only have to consider Mr. Udall's potential. The fact that Mr. Udall from all circumstances and all outside evidence is a loving father, husband and … contributing member to society, I can't ignore the conduct in the case either.

"I am required to consider that in determining what sentence is appropriate. I am required to determine the affect this sentence would have on other individuals contemplating the same actions. While I have uttered these words before and I will again … this type of action cannot be tolerated. Individuals that engage in this type of conduct need to know that if they, in fact, go beyond thought processes and take action, their actions will have consequences.

"Therefore, … I do not believe probation is appropriate in this case. I understand the factors indicated, but I think based upon the facts and circumstances of this case, I am most troubled by Mr. Udall's previous conduct, which was established. This was not in and of itself [aberrant] behavior in the sense that [he] had engaged in this type of conduct, perhaps not to this degree, but this type of conduct in the past."

Udall recognizes the seriousness of his offenses and the vulnerability of Julia. He asserts, "Ultimately when compared with the totality of [Udall's] life and the circumstances of this crime, the incident with Julia suggests that this was more of an isolated period of aberrant behavior where stress, first from [Daughter's] illness, and then from financial debt, *although not justifying [Udall's] conduct*, likely played a predominant role in affecting his judgment …." The court rejected this interpretation of the circumstances, observing that Udall's behavior in this case was *not* isolated or aberrant, but rather was similar to conduct Udall had engaged in in the past. The court

24.

implicitly recognized that the stressors in Udall's life—Daughter's illness and the family's medical bills—were circumstances that could likely recur. (Cal. Rule of Court, rule 4.414(a)(7).)

As the Attorney General points out, Udall's assertion ignores the facts that Daughter was first diagnosed with leukemia in January 2005, and she suffered a relapse in 2007. Udall claims his current crimes, which were committed in September 2009, were attributable to a lapse in judgment that was brought on first by Daughter's illness and later by financial stress. Yet, this lapse in judgment apparently also resulted in hundreds of other sexually explicit chats with purported minors. Under these circumstances, it is difficult to describe Udall's current crimes as isolated or aberrant. We see no abuse of discretion.

Udall next argues, "Here, the court appeared to simply gloss over if not totally disregard the abundant circumstances in mitigation that favored a grant of probation and clearly outweighed the circumstances in aggravation and far exceeded the *singular* aspect of this case the trial court found troubling." We disagree with Udall's characterization of the court's analysis. The court acknowledged that Udall was a loving father and husband and a contributing member of society with support from his church, all circumstances weighing in favor of probation. The court determined, however, that other considerations, including the facts and circumstances of the case and Udall's history of similar conduct, outweighed the mitigating criteria. Again, we observe that the evidence showed Udall had engaged in hundreds and hundreds of sexually explicit Internet conversations with persons purporting to be children.

Despite admitting that sexually explicit Internet chats with minors was his "vice" that he had been trying to break, Udall partially blamed Julia for his conduct, stating that she started it, she was a troubled kid, and she had done similar things with other men. It was reasonable for the court to be troubled by the fact that Udall had moved from engaging in sexually explicit chats with unknown persons who purported to be as young

25.

as 13 or 14 years old to engaging in similarly sexually explicit chats with Daughter's friend—a person with whom Udall had real-world interaction and whom he *knew* to be 13 years old. We see no abuse of discretion. In sum, Udall has failed to meet his heavy burden of establishing that the trial court's denial of probation exceeded the bounds of reason considering all the facts and circumstances.

## IV. *Presentence conduct credit*

The trial court sentenced Udall on July 26, 2011. He received conduct credit calculated at the rate of two days for every four days served, the accrual rate provided under former section 4019. (Stats. 2010, ch. 426, § 2; see *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1549.) Section 4019 was amended effective October 1, 2011, to provide for accrual of conduct credit at a day-for-day rate. (Stats. 2011, ch. 39, § 53.) Although Udall was sentenced before the current section 4019 came into effect, he claims he is entitled to its more generous rate of conduct credit accrual based on equal-protection principles. After Udall filed his opening brief, our court rejected this argument in *People v. Ellis*, *supra*, at page 1552. We decline to revisit *Ellis* and, as a consequence, Udall's equal-protection claim fails.

## V. *Abstract of judgment*

In counts 1 and 2, Udall was convicted of violating section 288.3, contacting a minor with intent to commit a sexual offense. In the abstract of judgment, for counts 1 and 2, the crimes are described as "ARGN MTG W/MINOR LEWD/LAS," presumably meaning arranging a meeting with a minor for the purpose of lewd or lascivious conduct. Udall correctly points out that this describes a violation of section 288.4, not section 288.3. The Attorney General agrees that the descriptions of the crimes are inaccurate and the abstract of judgment should be corrected. We therefore order the court to amend the abstract of judgment to delete the current descriptions of the crimes for counts 1 and 2 and replace them with an accurate description of section 288.3.

## *DISPOSITION*

The superior court shall modify the abstract of judgment to include accurate descriptions of the crimes for which Udall was convicted in counts 1 and 2.  The superior court shall forward the amended abstract to the appropriate prison authorities.

The judgment otherwise is affirmed.

_____
Wiseman, Acting P.J.

WE CONCUR:


_____
Levy, J.


_____
Kane, J.

27.